**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NARTRON CORPORATION,

      Plaintiff,

                                           Case No. 06-10683

v.                                         Hon. Lawrence P. Zatkoff

BORG INDAK, INC.,

      Defendant,

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on January 26, 2012

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.      INTRODUCTION

This matter is before the Court on:

1.  Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims in Count III (Shop Right) and Count IV (License) (Docket #95);

2.  Plaintiff's Motion for Summary Judgment on the First Affirmative Defense (Patent Invalidity) and Counterclaim Count I (Declaratory Judgment of Patent Invalidity and Unenforceability) (Docket #96);

3.  Plaintiff's Motion for Summary Judgment on Defendant's Fourth Affirmative Defense (Laches, Estoppel and Waiver) (Docket #97);

4.  Plaintiff's Motion for Summary Judgment on Infringement by Defendant (Docket #100);[1]

---

[1] None of Plaintiff's four summary judgment motions actually seeks judgment of the case (or the couter-complaint) *in toto*; rather, each such motion seeks partial summary judgment.  Notably, none of the four motions addresses damages or other requested relief in the event Defendant is

5.   Defendant's Motion for Partial Summary Judgment Based on the Lack of
     Infringement (Docket #101); and

6.   Defendant's Motion to Dismiss on Summary Judgment Based on Co-Inventorship
     (Docket #102).

The parties fully briefed all six motions.  The Court finds that the facts and legal arguments
material to all the motions have been adequately presented in the parties' papers, and the
decision process will not be aided by oral arguments.  Pursuant to E.D. Mich. Local R. 7.1(f) (2),
it is hereby ORDERED that the Motions be resolved on the briefs submitted.

## II.    BACKGROUND

In the mid-1990s, non-party Schukra of North America, Ltd. ("Schukra"), a Windsor,
Ontario company, supplied automakers with lumbar support systems for power seats in
automobiles.  Schukra also was working to enhance the lumbar support system to incorporate a
massage feature within the seat units it sold.  In 1994, Schukra contracted with a company called
Therm-O-Disc to develop a prototype massage control module, or controller, for the seat
massage unit.  On March 21, 1996, Schukra made a formal presentation of its prototype seat
massage units to Delphi Interior and Lighting Systems ("Delphi"), a tier one supplier to General
Motors.  The prototype massage units were subsequently ride tested in Cadillac automobiles in
June 1996.  Delphi and Cadillac shortly thereafter offered to purchase a number of seat massage
units for implementation into specific Cadillac models in the United States, provided said units
could be timely "productionized" (*i.e.*, made fully functional and manufactured to meet desired
performance specifications).  When Therm-O-Disc was unable to meet production demands

---

found to be liable for infringement of the patent-in-suit.  As such, the Court will treat Plaintiff's
four motions as motions for partial summary judgment.

and/or deadlines, Schukra contracted with Plaintiff to productionize the massage control module for Schukra.  In the words of Kevin Cherry ("Cherry"), Schukra's technical program manager for the massage control module project: "Plaintiff was responsible for the *engineering work*, and the manufacturing of the controller that was to control the massage unit" (emphasis added).  One of the conditions to "productionizing" the massage control module was that the controller had to be transparent to the seat control mechanism already in place.  As stated by Barry Jones ("Jones"), an employee of Delphi in 1996 and now Schukra's President:

> [T]he massage control module must have NO impact on the existing seat memory module.  [Plaintiff] must *develop* both driver (with memory) and passenger (no memory) massage modules.

(emphasis added).

Plaintiff successfully engineered a mechanism that satisfied Schukra's requirements when it designed a device it called the "transparency simulator," which consisted of a massage control module enhanced to not only maintain the higher priority of functions in the existing seat control but also include the enhanced massage control modules without interfering with the existing seat functions.  Plaintiff also filed with the U.S. Patent and Trademark Office ("PTO") a patent application with respect to the massage control modules ("MCMs") it designed and the mechanistic implications this design had on an integrated seat massager unit.  On April 11, 2000, the PTO issued Patent Number 6,049,748 (hereinafter, "the '748 Patent").  Todd Newman ("Newman"), David Shank ("Shank") and John Washeleski ("Washeleski"), each of whom was employed by Plaintiff and assigned his contribution or patent rights in the '748 Patent to Plaintiff, were identified as the "Inventors" of the '748 Patent.  In order to supply seat massager units to Delphi and Cadillac, Schukra continued to contract with Plaintiff for the MCMs for a

number of years.  Schukra hired Defendant in 2002 to replace Plaintiff as the sole supplier of the MCMs.

Plaintiff filed bankruptcy on December 19, 2002, and emerged from bankruptcy on January 25, 2006.  Plaintiff then filed this lawsuit on February 16, 2006, alleging that Defendant infringed protected claims of the '748 Patent (namely claims 1 and 7) when Defendant began manufacturing and supplying massage control modules to Schukra in Plaintiff's stead.  More specifically, Plaintiff seeks to enforce intellectual property rights it believes cover the two types of MCMs defined in the '748 Patent: (1) a memory MCM for power seats that record positioning data into computer memory so the driver may recall his preferred seatback angle and distance from the steering wheel, and (2) a non-memory MCM that provides massage functionality for power seats that do not record or recall seat positioning.

At the dispositive motion cut-off deadline, the parties filed the motions identified at the outset of this Opinion.  Previously, the Court granted Defendant's motion for summary judgment based on Plaintiff's failure to name one of the alleged co-inventors of the '748 Patent on its patent application (Docket #166).  The alleged co-inventor was Joseph Benson ("Benson"), a mechanical engineer for Schukra who claimed to have contributed to a number of claims in the '748 Patent, including claims 1, 2, 11, 12, 14 and 15.  The Court held that Benson was a co-inventor based on his contributions to claim 11 and dismissed Plaintiff's cause of action.  The Federal Circuit Court of Appeals later reversed this Court's ruling that Benson was a co-inventor on claim 11 of the '748 Patent, and the Federal Circuit remanded the case to this Court. *Nartron Corp. v. Schukra U.S.A., Inc.*, 558 F.3d 1352 (Fed. Cir. 2009).

### III.    LEGAL STANDARD

- 4 -

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

(A)     citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)     showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position

will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.    ANALYSIS REGARDING CO-INVENTORSHIP

### A. Applicable Law

Where a patent has been issued, there is a presumption that the named inventors are the true and only inventors. 35 U.S.C. § 282.  The burden of showing misjoinder or nonjoinder of inventors must be proved by clear and convincing evidence. *Hess v. Advanced Cardiovascular Systems, Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).  "35 U.S.C. § 256 provides that a co-inventor omitted from an issued patent may be added to the patent by a court 'before which such matter is called into question.'" *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998).  The only named co-inventors of the '748 Patent are Newman, Shank and Washeleski. As noted above, Defendant has asserted that Benson was a co-inventor as to claims 1, 2, 11, 12, 14 and 15.  In order to prevail on that argument, Defendant must, by clear and convincing evidence, overcome the presumption that Benson is not a co-inventor.

To date, only Defendant's assertion regarding claim 11 has been decided on the merits. As noted above, the Federal Circuit held that Benson was not a co-inventor as to claim 11.  Like this Court, however, the Federal Circuit did not express any opinion as to the other claims of the '748 for which Defendant asserted Benson was a co-inventor. *Nartron*, 558 F.3d at 1359 n.*. Therefore, the Court now must analyze Benson's alleged contribution to claims 1, 2, 12, 14 and 15, as well as the '748 Patent as a whole.

### B. Federal Circuit Ruling and Law

- 6 -

The Court's analysis shall be conducted in light of the following law set forth by the Federal Circuit in this case:

> Inventorship is a question of law[.] *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). "The inventors as named in an issued patent are presumed to be correct." *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) (quotation marks omitted). Thus, a party alleging non-joinder "must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004).

* * * * *

> In *Hess*, we held that Hess was not a co-inventor, when he had explained the state of the art to the inventors and had suggested that the inventors use a particular material in their product. 106 F.3d at 980-81. In this case, as in *Hess*, Benson's contribution to the extender amounted to "nothing more than explaining to the inventors what the then state of the art was and supplying a product for them for use in their invention." *Id.* at 981. Also, like the situation in *Hess*, the "extensive research and development work that produced" the claimed control module was done by [Plaintiff]'s employees. *Id.* Although Benson claims to have researched and developed a particular extender, [Defendant] admits that the basic concept of an extender, which is all that is disclosed in the '748 patent concerning the extender, was in part prior art. Similarly to *Hess*, therefore, Benson cannot be considered a co-inventor of claim 11. *See id.* Thus, in a factually similar case, we have held a putative inventor's contribution not to rise to the level of co-inventorship. This is not a case in which a person claims to be an inventor because he has suggested a non-obvious combination of prior art elements to the named inventors. Such an infidel may be a co-inventor. There is not, and could not be, any claim that the addition of the extender here was anything but obvious. Benson's contribution therefore does not make him a co-inventor of the subject matter of claim 11.

> One further point should be made. [Defendant] asserts that Benson was the inventor of the sole feature added by claim 11. However, a dependent claim adding one claim limitation to a parent claim is still a claim to the invention of the parent claim, albeit with the added feature; it is not a claim to the added feature alone. Even if Benson did suggest the addition of the prior art extender to what [Plaintiff] had invented, the invention of claim 11 was not the extender, but included all of the features of claims 1, 5, and 6, from which it depends. It has not yet been determined whether Benson contributed to claim 1 (although he does not claim to be a co-inventor with respect to claims 5 and 6). If Benson did not make those inventions, he does not necessarily attain the status of co-inventor by providing the sole feature of the dependent claim. *See id.* (holding that Hess was

- 7 -

not a co-inventor, even though he supplied "heat-shrinkable plastic," which was
the only additional limitation recited in dependent claim 12 of the patent in suit).

> [Defendant] also asserts that Benson was a co-inventor of the '748 patent
> because he realized that a control module with certain specifications would be
> useful, and he gave [Plaintiff] a description detailing the ultimate functions of the
> control module. [Plaintiff], according to [Defendant], simply carried out the
> invention by building that control module. However, "[o]ne who merely suggests
> an idea of a result to be accomplished, rather than means of accomplishing it, is
> not a joint inventor." *Garrett Corp. v. United States*, 422 F.2d 874, 881 (Ct. Cl.
> 1970); *see also Eli Lilly*, 376 F.3d at 1359 (stating that one who is "too far
> removed from the real-world realization of an invention" is not a co-inventor);
> *Ethicon, Inc. v. U.S. Surgical Corp.*, 937 F.Supp. 1015, 1035 (D. Conn. 1996)
> ("An entrepreneur's request to another to create a product that will fulfill a certain
> function is not conception—even if the entrepreneur supplies continuous input on
> the acceptability of offered products." (quotation marks omitted)), *aff'd*, 135 F.3d
> 1456 (Fed. Cir. 1998). Thus, Benson is not entitled to co-inventorship by simply
> posing the result to [Plaintiff] and leaving it to [Plaintiff] to figure out how to
> accomplish it.

*Nartron*, 558 F.3d at 1356, 1358-59.

### C. Analysis

As set forth in footnote 1 of this Court's March 31, 2008, Opinion and Order:

> At various times, and with varying degrees of vigor and support,
> Defendant also asserts that Benson [and/or others] contributed to
> claims 1, 2, 12, 14 and 15 of the '748 Patent. Defendant has not,
> however, offered the name(s) of any other such co-inventor(s).

In other words, Defendant has set forth little argument, to say nothing of evidence, to

demonstrate that Benson contributed to claims 1, 2, 12, 14 and 15. In fact, as Benson admitted:

1.  He had "very little" working knowledge of the software logic
    within the Plaintiff's massage control module,

2.  He did not have the electronic skills to do the circuitry or the
    programmable logic required to realize the transparency simulator
    of claim 1 of the '748 Patent.

3.  The lumbar support adjustor recited in claim 12 was not his
    contribution because it pre-dated his employment with Schukra,

4.    The extender element described in claim...14 was a "conventional mechanical connection," and

5.    The multiple adjustors recited in claim 15 also were conventional technology.

Benson also admitted he had no skill set in electronics engineering, as evidenced by the following exchange at this deposition:

Q.    You have never designed a driver circuit, correct, implemented electronically, correct?

A.    That's correct.

Q.    And through your education and work experience you don't have the skill set to design electrical circuits, correct?

A.    That's correct.

In addition, Benson has admitted on multiple occasions that he was not involved in the design or development of the MCMs that included the transparency simulator. For example, as Benson stated in his affidavit: "**Nartron was involved in this project to add a transparency circuit feature to the controller** in order to make it transparent to the automotive computer **as we conceived it and presented it to Nartron**." (emphasis added). Likewise, as Benson stated at his deposition, "Again, my role in this is to pass along the specifications we receive from Delphi to get this to work. The **circuitry and the packaging was [sic] Nartron's responsibility**." (emphasis added). The testimony of Schukra personnel reinforces Benson's statements. *See, e.g.*, Cherry Dep., p 12, ll. 18-24 ("Q. What did you understand Nartron's assignment to be in relation to the technical development of the massage control module? A. They were responsible for *engineering work*, and manufacturing of the controller that was to control the massage unit."). *See also* Jones Declaration ("the massage control module must have NO impact on the

- 9 -

existing seat memory module.  Nartron must develop both driver (with memory) and passenger (no memory) massage modules.").

### D.  Conclusion

For the reasons stated above, the Court finds that Benson did not make any contribution to the engineering of the massage control module claimed in the '748 Patent.  Benson's assertions of contributions in claims 1, 2, 12, 14 and 15 of the '748 Patent (as well as claim 11, as previously determined) ring hollow because Benson did not exercise any skill beyond what would have been conventional in the art.  Accordingly, the Court finds that Benson (and Schukra) "simply pos[ed] the result to [Plaintiff] and le[ft] it to [Plaintiff] to figure out how to accomplish it."  As the Federal Circuit held when considering the appeal in this case, such involvement does not entitle a person to co-inventorship. *See Nartron*, 558 F.3d at 1359.  The Court therefore concludes that Defendant cannot show, by clear and convincing evidence, that: (1) Benson conceived of the contribution of any element, or (2) Benson's contribution to the claimed invention is "not insignificant in quality."  As such, the Court holds that Benson was not a co-inventor of the '748 Patent.  Accordingly, the Court denies Defendant's Motion to Dismiss on Summary Judgment Based on Co-Inventorship.


### V.    ANALYSIS REGARDING THE INFRINGEMENT MOTIONS

In its Motion for Summary Judgment on Infringement, Plaintiff argues this Court should grant summary judgment in its favor based on: (1) Defendant's direct infringement of claim 1 of the '748 Patent, and (2) Defendant's contributory infringement of claim 7 of the '748 Patent.  In its Motion for Partial Summary Judgment Based on Lack of Infringement, Defendant counters that its MCM for non-memory systems cannot directly infringe (and therefore cannot

contributorily infringe) the protected claims of the '748 Patent because Defendant's device is missing an entire aspect detailed within the claim limitations.

## A.  Patent Infringement

Plaintiff has the burden of proving by a preponderance of the evidence that the asserted claims are infringed. *See, e.g., S.R.I. Int'l v. Matsushita Elec. Corp. of Amer.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985).

### 1.   Direct Infringement

35 U.S.C. § 271(a) defines patent infringement:

> "Except as otherwise provided in this title, whoever without authority makes, issues, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent."

"To prove direct infringement, the plaintiff must establish by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005) (citation omitted).  "Literal infringement requires that each and every limitation set forth in a claim appear in an accused product." *Id.* (quoting *Franks Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004)). *See also Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255 (Fed. Cir. 1985) (citations omitted).  Establishing direct infringement by arguing there is no evidence that the accused device would be noninfringing may be tested first by determination of the scope of the claim at issue, and second "by an examination of the evidence before the court to ascertain whether, under § 271(c), use of the [accused device] would infringe the claim as interpreted." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir. 1990).

However, "[t]he scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, *Ltd.*, 535 U.S. 722, 732 (2002) (citing *Winans v. Denmead,* 56 U.S. (15 How.) 330, 347 (1854)). In other words, "[i]nfringement *may* be found under the doctrine of equivalents if an accused product 'performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention.'" *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677, 683 (Fed. Cir. 1990) (quoting *Pennwalt Corp. v. Durand-Wayland, Inc.,* 833 F.2d 931, 934 (Fed. Cir.1987) (citations omitted) (emphasis in original)). The doctrine of equivalents may be limited through prosecution history estoppel[2] by restricting the patentee from "contending later in an infringement action that his claims should be interpreted as if limitations added by amendment were not present or that claims abandoned are still present." *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1579 (Fed. Cir. 1983) (citing *Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362 (8th Cir. 1982)). Therefore, if "the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection [a rejection indicates the examiner did not believe the original claim could be patented], he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent." *Id.* at 733-34.

2. *Contributory Infringement*

In addition to direct infringement of a patent pursuant to 35 U.S.C. § 271(a), a patent can be contributorily infringed, as set forth in U.S.C. § 271(c):

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process,

---

[2] Prosecution history estoppel is a rule that ensures a patent's claims are interpreted in light of the proceedings with the PTO during the patent application process. *Festo*, 535 U.S. at 733.

constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

A plaintiff claiming contributory infringement must prove the following elements:

> (1)     the defendant sold a component or apparatus for use in practicing the patented process;
>
> (2)     the component or apparatus constitutes a material part of the invention;
>
> (3)     the defendant knew the component or apparatus was especially made or adapted for use in infringing the patent; and
>
> (4)     the component or apparatus sold is not a staple article or commodity of commerce suitable for substantial noninfringing use.

*C.R. Bard, Inc.*, 911 F.2d at 673. *Preemption Devices, Inc. v. Minnesota Mining Mfg. Co.*, 803 F.2d 1170, 1174 (Fed. Cir. 1986), *aff'd*, 824 F.2d 977 (Fed. Cir. 1987), *cert. denied*, 389 U.S. 830 (1987) (contributory infringement requires knowledge of the patent, as well as of the alleged infringement).   Contributory infringement requires knowledge of the patent, as well as of the alleged infringement. *Preemption Devices, Inc.*, 803 F.2d at 1174.   "[I]f there is no direct infringement of a patent[, however,] there can be no contributory infringement."  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 483 (1964).  *See also Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986).

**B.     Claim Construction**

In a patent infringement case, the Court construes all disputed terms.  *O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  "[C]laim interpretation . . . is an issue *of law*, and a dispute regarding that legal issue does not preclude summary judgment." *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 654 (Fed. Cir. 1984) (citations omitted) (emphasis in original).  "A disputed issue of fact may, of course, arise in

connection with interpretation of a term in a claim if there is a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation," thus precluding a court from ruling on summary judgment. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989). Absent such evidentiary conflict, "claim interpretation may be resolved as an issue of law by the court on summary judgment taking into account the specification, prosecution history, or other [extrinsic] evidence." *Id.* "Conflicting opinions on the meaning of a term which are merely conclusory do not create such evidentiary conflict." *Id.*

The Court's task when assessing infringement requires a two-step analysis: (1) the claims must be properly construed to determine the meaning and scope of claim limitations; and (2) the accused device must be compared to the properly interpreted language in the claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). In construing the terms of a patent claim, the Court first examines "the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citations omitted). The Court generally must give the words of a claim their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted).

The Court then must review "the specifications[3] to determine whether the inventor had used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at

---

[3] "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112.

1582. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id*. A specification also potentially may reveal an intent of the inventor to disclaim, or disavow, the scope of the particular claim. *Phillips*, 415 F.3d at 1316.

The third type of intrinsic evidence the Court must consider for proper claim construction is the prosecution history of the patent before the PTO. *Vitronics*, 90 F.3d at 1582. "Statements about a claim term made by an examiner during prosecution of an application *may* be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Proctor & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) (emphasis added). As with the specification, the patent applicant may "provide[] evidence of how the PTO and the inventor understood the patent . . . Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Moreover, "[t]he examiner's *unilateral remarks* alone do not affect the scope of the claim, let alone show a surrender of claimed subject matter that cannot be recaptured under the doctrine of equivalents." *Salazar*, 414 F.3d at 1347 (emphasis added).

The Court also may use extrinsic evidence to elicit proper claim construction. *Phillips*, 415 F.3d at 1317. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980 (citations omitted). This extrinsic evidence is "less significant than the intrinsic record" and is not likely "to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence." *Phillips*, 415 F.3d at 1317-19.

**C.  Proper Claim Construction of the Term "Transparency Simulator"**

- 15 -

Plaintiff states that:

> Properly construed, the term "transparency simulator" means a
> component of the massage control module that allows functions of
> the massage control module to be transparent to the operation of
> the existing seat control system.

Plaintiff's assertion is consistent with, and supported by, the specification of the '748 Patent,

which states:

> References to the transparency simulator refer to the feature that
> the seat control module is transparent in function to the existing
> seat control mechanism, regardless of whether it enhances the
> system function, monitors the system function, or guides the
> system function through virtual signals.

'748 Patent, col. 2, ll. 23-27. This definition, chosen by the patentee,[4] reveals multiple scenarios

that bring about said transparency. It accurately portrays what is detailed in later specifications;

namely, that virtual signals: (1) are not the only means by which transparency can be achieved,

(2) can be used to at least "guide system function," and (3) are not of necessity to "enhancing" or

"monitoring" system function (variable or continuous voltage signals and other analog outputs

may also accomplish this).

Defendant contends that, for purposes of proper claim construction, the term

"transparency simulator" must be construed as a device that outputs "virtual signals" to: (1) the

seat controller in memory type seat systems, or (2) the MCM itself in non-memory seat systems.

The Court notes that Defendant (intentionally or otherwise) relies on an erroneous recitation of a

statement within the '748 Patent to support its contention regarding the transparency simulator.

Specifically, when quoting the specification describing the transparency simulator, Defendant's

briefs repeatedly and consistently have included a comma between "function" and "through" in

---

[4] The patentee may act as his own lexicographer if the disputed term(s) are defined within the
patent claims and specifications. *Phillips*, 417 F.3d at 1319.

the last line of the quoted language in the preceding paragraph (*i.e.*, '748 Patent, col. 2, ll. 23-27).  The comma added by Defendant completely modifies the meaning of the sentence, perhaps explaining why Defendant erroneously argues that sending "virtual signals" is the only desired manner to achieve system transparency.

For the reasons set forth below, including the language found in the claims and specifications of the '748 Patent, as well as its prosecution history, the Court concludes that the proper construction of "transparency simulator" is <u>not</u> limited to a device which only sends a "virtual signal" output for an existing seat controller to receive (*i.e.*, a memory MCM).

1.  *Claim Language*

The '748 Patent application states that what is claimed is: (a) for claim 1 (the memory MCM), a seat control module that includes, among other components, "a transparency simulator for maintaining full function of said seat control and removing indications of repeatedly adjusting said lumbar support position;" and (b) for claim 7 (the non-memory MCM), a seat control mechanism that includes a massage control module with "a transparency simulator for maintaining original movement and inducing said enhanced movement of said lumbar support." '748 patent, col. 19-20.  Accordingly, the Court finds that the language of the claims expressly provides that a transparency simulator is a component of both the memory MCMs and non-memory MCMs.

2.  *Specifications*

"Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (citations omitted).

In addition, disputed claim terms must be read in light of the specification(s) of which they are a part. *Environmental Instruments v. Sutron Corp.*, 877 F.2d 1561, 1564 (Fed. Cir. 1989).

According to: (a) the specifications of the '748 Patent, and (b) the type of seat system the MCM is meant to provide with functionality, several methods may be employed to achieve the necessary transparency. As detailed in a description of the preferred embodiment of the device in the '748 Patent:

> The [massage control] module may simulate a transparent connection, for example, by installation as an in-line complement to or a replacement of an existing memory type seat controller (36) or as a complement to an existing non-memory type seat control (23).

'748 patent, col. 4, ll. 49-54. *See also* Washeleski Dep., pp. 23, ll. 16-25, pp. 24, ll. 1-9. Furthermore, "[the non-memory MCM (23)] will not interfere with any other motor controller and will function in low priority dependent operation to provide the lumbar massage feature for that seat mechanism." '748 Patent, at col. 5, ll. 50-53. A specification exists for achieving transparency simulation to maintain original movement in the non-memory seats:

> In the case of a non-memory type seat control system 22 … the lumbar support position can alternatively be analytically derived in various ways such as an absolute encoder on the motor where added expense can be accommodated. A resolver on the motor or a simple incremental encoder on the lumbar support drive motor may be used in less expensive embodiments.

*Id.* at col. 4, ll. 58-65.

The specifications also include methodologies that can be utilized to make the massager in motion appear static and therefore transparent to the system. For example, one preferred embodiment that does not necessarily require a virtual output from the massage control module to a positioning sensor is:

> Alternative to determining lumbar support position by direct measurement of some physically sensed variable is the option of empirically measuring the

relative amounts of time, under ambient conditions of temperature, voltage, and lumbar load, to drive the lumbar support from either end of travel (EOT).

*Id.* at col. 5, ll. 3-9.

The Court further finds that the specifications of the '748 Patent contemplate that a "transparency simulator" includes such potential analog outputs as power, current, or voltage. As such, generating various types of output signals (in order to maintain original functionality and system priority) is an aspect of the massage control module transparency simulator protected by the claims of the '748 Patent.

   *3. Prosecution History*

The examination of the prosecution history of a disputed patent may enable a court to limit claim scope through disavowal or acquiescence. *Phillips*, 415 F.3d at 1319. The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office." *Vitronics*, 90 F.3d at 1582. In the Reasons for Allowance of the '748 Patent, the Patent Examiner in the PTO stated (in relation to the memory MCMs only):

> The prior art if record [sic] does not teach or suggest a seat control module for introducing massage to a seat control with an adjustable lumbar support, and control actuators. Wherein the control module includes an intercept interface, and a driver. In particular, the prior art does not teach or suggest a transparency simulator which provides for the massage control module to be transparent to the higher priority of all functions of existing seat control. The massage control module, through the transparency simulator, intercepts the true lumbar support position signal from a sensor and provides a simulated virtual lumbar support position signal to the seat controller.

'748 patent, Reasons for Allowance, V. Lissi Mojica, 3/28/1999.

Defendant argues that this language indicates a transparency circuit in *any* allowed claim must "provide a simulated virtual lumbar support position signal to the seat controller." As Plaintiff did not respond to the Patent Examiner's statement, Defendant argues that Plaintiff agreed with the Patent Examiner and is bound by Defendant's interpretation. The Court

disagrees with Defendant's arguments for several reasons.  First, the Patent Examiner did not reject Plaintiff's claims.  Second, Plaintiff was not ordered to relinquish any claim language.  Rather, the Patent Examiner's statement merely detailed the primary reason why the Plaintiff's devices with a transparency simulator component were sufficiently different from, and would not be suggested by, any prior art.  Third, a disavowal of claim limitations is not established simply because Plaintiff did not object when it received the Patent Examiner's Reasons for Allowance.  An uncontested statement made by the Patent Examiner does not alter the scope of the claims.  *See Salazar*, 414 F.3d at 1347 ("the examiner's unilateral remarks alone do not affect the scope of the claim, let alone show a surrender of claimed subject matter.").  Finally, Plaintiff did not affirmatively acquiesce in the Patent Examiner's statement.

### 4.  Conclusion

Defendant has presented no probative evidence pertinent to the claim interpretation of "transparency simulator" that creates a genuine dispute of fact.  Accordingly, it is appropriate for the Court to determine the meaning of transparency simulator on summary judgment.  *Johnston*, 885 F.2d at 1580.  Therefore, for the reasons set forth above, including the plain language of claims, the specifications of the '748 Patent and its prosecution history, the Court concludes that a proper interpretation of "transparency simulator" means a component of a MCM that enables lumbar massage application and simultaneously "[prioritizes] original functions," making the controller operate transparently to the existing seat control mechanism and electrical system in the vehicle.

### D.  Defendants MCMs were Sold in, and/or Imported into, the United States

Defendant argues Plaintiff has not provided proof that Defendant's allegedly infringing activity occurred in the United States, as required for direct infringement pursuant to 35 U.S.C. §

271(a) and/or contributory infringement pursuant to 35 U.S.C. § 271(c). Defendant argues that "[i]f the goods are shipped out of the country and the sales transaction takes place completely outside the United States, then the patent statute does not reach the transaction." *Robotic Vision Systems v. View Engineering Inc.*, 39 U.S.P.Q.2d (BNA) 1117, 1119, 1995 WL 867456 (C.D. Cal. 1995) (citing *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1915)); *John Hopkins University v. Cellpro, Inc.*, 152 F.3d 1342, 1367 (Fed. Cir. 1998). The Court finds Defendant's argument unavailing under the circumstances of this case, a case where Defendant manufactured the allegedly infringing MCMs in the United States.

Defendant's reliance on *Robotic*, *Dowagiac* and *Cellpro* is misplaced. In those cases, the allegedly infringing items: (1) were determined not to be infringing items because they were manufactured in the United States *prior* to the issuance of the patent (*Robotic*); (2) were made in the United States but not by the defendant, whose only activity related to the infringing items was to sell the items in Canada after the items passed out of the makers' hands, thus making the place of sale (rather than the place of manufacture) the controlling factor (*Dowagiac*); and (3) were manufactured by the defendant in another country (Canada), and were "for use in products to be sold *outside* the United States" (*Cellpro*). Moreover, each of those three cases makes it clear that if a party "makes" the infringing product in the United States during the term of the applicable patent, the manufacturing party has violated Section 271(a).

Here, the undisputed evidence is that Defendant, with a principal place of business in Michigan, produced and manufactured the memory and non-memory MCMs exclusively within the United States. As Section 271(a) states, in part: "whoever without authority **makes**, issues, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefore, infringes the patent." Accordingly, as Defendant manufactured the MCMs

exclusively within the United States during the term of the '748 Patent, the Court concludes that, to the extent that either of Defendant's MCMs directly infringe on the '748 Patent, such direct infringement occurred in the United States and in violation of Section 271(a).

Defendant argues that it "shipped the control modules to Canada and has no knowledge of how they were used or if they were used." The Court finds this argument disingenuous. First, as Defendant has admitted, Defendant sold its product from within Michigan to Schukra in Windsor, Ontario. The very purpose of Defendant's arrangement with Schukra was to produce memory MCMs and non-memory MCMs that Schukra would incorporate into seats produced by Schukra in Windsor. In addition, it is undisputed that Schukra's seats would be and were installed in Cadillac's "E/K/Ksp" vehicles, vehicles that were assembled at a General Motors plant in Hamtramck, Michigan, United States of America. Thus, Defendant's suggestion that it did not know how or if its control modules were used is misleading, at best. Therefore, even if the MCMs produced by Defendant could be considered component parts of the MCMs covered by the '748 Patent, the infringing activity associated with the MCMs also satisfied the "within the United States" element of contributory infringement under Section 271(c).

### E. Infringement of the '748 Patent by Defendant's Memory MCMs

Claim 1 of the '748 Patent is as follows:

1. A seat control module for introducing massage to a seat control with an adjustable lumbar support, and control actuators, the **control module comprising:**

    a **modular housing** including in-line connectors for coupling said module to a seat control harness connector;

    an **intercept interface** for receiving inputs from said control actuators;

- 22 -

a **driver** for repeatedly adjusting said lumbar support position through a predetermined range of movement in response to one of said control actuators; and

a **transparency simulator** for maintaining full function of said seat control and removing indications of repeatedly adjusting said lumbar support position.

'748 patent, col. 19, ll. 13-26 (emphasis added). Although only a product specification of the function of Defendant's devices is on record, sufficient technical insight exists enabling the Court to compare the accused devices and find them both to infringe the above claims. These product specifications suffice because Defendant offers no other design requirements distinguishing its devices from those claimed in the '748 Patent.

For the following reasons, the Court finds that Defendant's memory MCM embodies all of the elements of claim 1, including a transparency simulator. First, Larry Krueger, Defendant's President, acknowledged that all of the limitations of claim 1 of the '748 Patent were met by Defendant's memory MCM, except that he believed Defendant's modules lacked the "transparency simulator" limitation, as he understood the meaning of the term. As set forth above, however, Defendant's interpretation of "transparency simulator" (*i.e.*, a device that must output "virtual signals") is flawed.

Second, Defendant's MCMs do contain transparency simulators, albeit not by name. As the following pertinent quotations from the Product Specifications utilized by Defendant demonstrate, each element of claim 1 of the '748 Patent exists in Defendant's MCMs:

- The module shall be connected to the seat harness by means of a 16-way header connector. (**the equivalent of '748 Patent's modular housing**)

- Lumbar massage operation will begin with a lumbar up switch input of no more than 390 ms. Up Switch and Down Switch Inputs. (**the equivalent of '748 Patent's intercept interface**)

- The massage module controls the vertical adjustment reversible DC motor. Massage motion will be accomplished by energizing the up/down lumbar motor continuously in one direction, causing the lumbar to move up and down 50 mm in each direction. **(the equivalent of '748's Patent driver)**

- The massage function will operate for 10 minutes +/- 10 seconds and return to the position it was at before the massage began. *The massage module shall neither alter nor inhibit the function or performance of any other electrical system on the vehicle except as specified in this document.* **(the equivalent of '748 Patent's transparency simulator)**

Product Spec., pp. 7-11 (emphasis added). As such, the Court finds that Defendant's Product Specification discloses each limitation of claim 1. In addition to the foregoing, the Court finds that Defendant's Product Specification tracks how the transparency simulator: (a) functions in Plaintiff's memory MCM, and (b) is protected by the claims and specifications of the '748 Patent. Specifically, the Product Specification states that "during a lumbar massage, the massage module must output a simulated stationary lumbar vertical position signal to the memory seat module. This prevents the memory seat module from seeing the lumbar up/down in motion." *Id.* at 10.

Defendant argues that the term driver, as used in claim 1, is in some way external to the massage controller or control module, but its argument is unsubstantiated. In fact, Defendant's President (Krueger) has admitted that both Defendant's memory MCMs and Defendant's non-memory MCMs include the driver of claim 1 and driver circuit of claim 7. Moreover, the plain language of the patent claim, as corroborated by the common definition and use of an electronic driver,[5] indicates clearly how such a driver would operate as a function of the MCM:

> a **driver** for repeatedly adjusting said lumbar support position through a predetermined range of movement in response to one of said control actuators; and

---

[5] The common definition of an electrical driver is "an electronic circuit that supplies input to another electronic circuit." *See* Modern Dictionary of Electronics, R. Graf (1999).

 In other words, the driver is a part of the MCM (just as the modular housing intercept interface and transparency simulator are), and there is no requirement that the driver be peripherally external to the MCM itself.  The "driver" in the control module of claim 1 receives electrical inputs from control actuators and relays electrical signals to the motor that drives the lumbar support position, imitating massage function.  Significantly, Defendant's Product Specifications reveal that its MCMs do not establish this massage movement through any substantially different means:

> [T]he massage module controls the vertical adjustment reversible DC motor. Massage motion will be accomplished by energizing the up/down lumbar motor continuously in one direction, causing the motor to move up and down 50 mm in each direction.

For the reasons set forth above, Defendant has presented the Court with: (1) no information that creates a genuine issue of material fact as it relates to Defendant's literal infringement of Plaintiff's memory MCM, and (2) no support for a finding of non-infringement with respect to claim 1.  Thus, the Court finds that the undisputed evidence repudiates Defendant's assertion that its memory MCMs do not exploit the transparency simulator of claim 1.  The Court also finds that the memory MCM manufactured and sold by Defendant: (a) embodies all the elements of claim 1, as properly construed,  including a transparency simulator, and (b) literally infringes claim 1 of the '748 Patent. *Builders Concrete, Inc.*, 757 F.2d at 255.  Accordingly, the Court holds that Plaintiff is entitled to judgment as a matter of law on Defendant's direct infringement of Plaintiff's patented memory MCM (claim 1).

## F.  Infringement of the '748 Patent by Defendant's Non-Memory MCMs

Claim 7 of the '748 Patent states:

7.  A seat control mechanism comprising:

a **vehicle seat** having a position adjustment mechanism, wherein said mechanism includes a lumbar support, at least one motor, and an adjustor responsive to said motor for displacing said lumbar support;

a **motor control** including at least one actuator for actuating said motor and said adjustor; and

a **massage control module** including an <u>intercept interface</u> for receiving an output from said at least one actuator, a <u>driver circuit</u> for signaling said motor to repeatedly adjust said lumbar support as an enhanced movement, and a *transparency simulator* for *maintaining original movement and inducing said enhanced movement of said lumbar supports*, said driver discriminating between a first predetermined movement of said at least one actuator and a second movement of said at least one actuator before signaling an enhanced movement of said lumbar support or maintaining original movement.

'748 patent, col. 20, ll. 1-19 (emphasis added).

Defendant's President, Larry Krueger, admitted during his deposition that Defendant's non-memory MCM was part of a system that met the "vehicle seat" and "motor control" limitations of claim 7. Krueger also conceded that Defendant's non-memory MCMs included the "intercept interface for receiving an output from . . . at least one actuator" and the "driver circuit for signaling said motor to repeatedly adjust said lumbar support as an enhanced movement." Krueger opined, however, that Defendant's non-memory MCM lacked one of the elements of Plaintiff's non-memory MCM, specifically a "transparency simulator" that sends "simulated virtual signals to the seat controller." Defendant's argument fails for several reasons.

First, as discussed above, Defendant's Product Specifications designate that Defendant's non-memory MCMs are transparent to the existing seat system (*i.e.*, there is a transparency simulator):

The massage module shall neither alter nor inhibit the function or performance of any other electrical system on the vehicle except as specified in this document.

- 26 -

Defendant's Product Spec. at 9.

Second, Defendant erroneously concludes that its MCMs for non-memory power seats do not infringe a single claim of the '748 Patent because its "non-memory massage control modules do not intercept signals or send virtual signals," a "the hallmark of the '748 Patent" (*i.e.*, the "transparency simulator" is necessarily present in each claim). As discussed above, however, Defendant's argument is based on its erroneous reading of the meaning of "transparency simulator" set forth in the '748 Patent specifications. Likewise, a reading of the specifications does not support Defendant's argument that "the absence of an external virtual signal sent to achieve transparency with the original seat system is sufficient to conclude no transparency simulator is found whatsoever." Rather, as the Court has determined, neither the plain language of the claims, nor the specifications within the '748 Patent, mandate that the controller send virtual signals to a positioning sensor for establishing the desired transparency.

In other words, Defendant's transparency simulator construction impermissibly reads non-memory module embodiments out of the claims of the '748 Patent. "A claim interpretation that reads out a preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003) (quoting *Vitronics*, 90 F.3d at 1583). As set forth above, the technical specifications in the '748 Patent describe how transparency is achieved through different means in non-memory controllers. Specifically, the descriptions about how to accomplish vertical lumbar functionality are illustrative of how schematically diverse the transparency simulator can be.

Third, Defendant misinterprets the phrase "a transparency simulator for maintaining original movement." Defendant would have the Court interpret "original movement" as

"reverting to the original position stored by memory seat position controllers."  Defendant's interpretation does not reflect the correct meaning of "original movement."  The plain and ordinary language of claim 7, especially when read in conjunction with the proper definition of the transparency simulator in the specification in the patent, establishes why Defendant's interpretation is erroneous.

The correct interpretation of "original movement" is the manually-controlled power seat movement available before adding the MCM controls that are unimpeded by addition of the MCM.  *See* '748 Patent, col. 2, ll. 53-58 ("The existing seat controller module can be replaced with an alternative massage control module (MCM) offering current control features plus increased functionality upgrades, especially to include the new and improved feature of automatic lumbar massage without affecting the original functions.").  In fact, the same transparency simulator for "maintaining original movement" is covered in both claims 1 and 7 of the '748 Patent, as set forth in the following specification:

> This method of functional control modification is based upon the in-line modular massage control module 34 intercepting real signals and/or power and transparently substituting <u>simulated signals and/or power</u> between the seat controller 21 and the external devices of sensor 40, motor 18, and switches 46. *The case of the non-memory system 14 is simpler by virtue of not having to interface sensor signals to the seat control.*

'748 Patent, col. 8, ll. 33-41 (emphasis added).  As the language reproduced in italics above clearly illustrates, Plaintiff's non-memory MCMs do not need to communicate exclusively with seat control to achieve transparency.  Rather, for non-memory seat systems, the MCM acts as the seat controller found in memory position systems; it is the controller which runs the motor and enables massage functionality within the seat.  *See* Washeleski Dep., pp.123 ll. 13-24, pp. 124 ll. 1-15.

Accordingly, the Court finds that "maintaining original movement" means preserving the ability to adjust the power seat controls as if no massage controller had ever been installed. Both of the MCMs manufactured by Defendant achieve transparency between the control module and the existing seat system while preserving the ability to control the seat-forward and seat-back positioning. Defendant's Product Spec., pp. 7-10 ("After massage, the module returns to its original position" and "If a massage operation is not in progress, and a lumbar down switch input of greater than 20 ms occurs, the lumbar will begin traveling downward. If the lumbar down switch is released after less than 390 ms, the lumbar will return to the position it was at before the lumbar down switch input occurred.").

Finally, Defendant has not supplied the Court with any evidence that would indicate that the accused device is noninfringing. Moreover, as set forth above, nothing in the record shows that Defendant's non-memory MCM operates in a manner inconsistent with Plaintiff's protected non-memory MCM. To the contrary, the drawings and specifications governing the MCMs manufactured by Defendant reflect that:

> The lumbar vertical position sensor provides an analog voltage which varies directly with the seat lumbar vertical position … The non-memory massage module will provide a supply voltage for the lumbar vertical sensor … [and] the module shall activate the sensor feed output whenever the module is awake; otherwise, the sensor feed output shall remain inactive.

For the reasons set forth above, the Court concludes that: (1) Defendant's non-memory MCM includes a transparency simulator, and (2) that transparency simulator sends a signal (voltage) that influences system positioning sensors to believe the displacement of the moving lumbar support remains constant, thereby maintaining original movement and higher system priority. The Court also finds that the non-memory MCM manufactured and sold by Defendant: (a) embodies all the elements of claim 7, as properly construed, including a "transparency simulator

for maintaining original movement," and (b) literally infringes claim 7 of the '748 Patent. *Builders Concrete, Inc.*, 757 F.2d at 255.

Accordingly, the Court holds that Plaintiff is entitled to judgment as a matter of law on Defendant's direct infringement of Plaintiff's patented non-memory MCM (claim 7).[6]  For the same reasons, Defendant's motion for partial summary judgment based on lack of infringement (based on the non-memory MCMs produced by Defendant) must be denied.

## VI.    ANALYSIS REGARDING EQUITABLE DEFENSES

Defendant has asserted the affirmative equitable defenses of laches, estoppel, and waiver. Plaintiff maintains that these defenses should be dismissed as a matter of law.  Plaintiff asserts that the proof elements of each defense are not supported by the pretrial evidentiary record, as Plaintiff did not: (1) unreasonably or inexcusably delay filing suit on any basis that would invoke equity, (2) intentionally mislead Defendant to its own detriment, or (3) intentionally relinquish or abandon a known right.

### A.  Laches Defense

---

[6] A finding of contributory infringement of claim 7 of the '748 Patent by Defendant's non-memory MCM is also substantiated.  The device literally infringes the first two limitations of claim 7 (vehicle seat and motor control), and infringes through the doctrine of equivalents the control module limitation, specifically the transparency simulator limitation.  As discussed above, Defendant's non-memory MCM achieves substantially the same transparency function through substantially similar means to attain a result that is substantially similar to the claimed device in the '748 Patent. *Wilson Sporting Goods* Co, 904 F.2d at 683.  For example, Defendant's non-memory MCM is: (1) is a component sold by Defendant for use in practicing the patented massage functionality process; (2) in and of itself, a material part of the patented invention; and (3) not a staple article of commerce suitable for noninfringing use.  Defendant knew from correspondence from Schukra (and, later, Plaintiff) that the non-memory MCMs it manufactured could be infringing a patent (namely, the '748 Patent).  Upon examination of all the evidence, this Court finds, under 35 U.S.C. § 271(c), that use of Defendant's non-memory MCMs infringes the proper construction of claim 7 of the '748 Patent. *C.R. Bard, Inc.*, 911 F.2d at 673.

In order to invoke the laches defense, a defendant must prove, by a preponderance of the evidence, the following factors:

> (1)     That the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and
>
> (2)     That the delay operated to the prejudice or injury of the defendant.

*See Costello v. United States*, 365 U.S. 265, 282, 81 S. Ct. 534, 543, 5 L. Ed. 2d 551 (1961); *Meyers v. Brooks Shoe Inc.*, 912 F.2w 1459, 1461, 16 USPQ2d 1055, 1057 (Fed. Cir. 1990); *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1572, 4 USPQ2d 1939, 1940 (Fed. Cir. 1987). "Where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity," a presumption of laches will arise. *A.C. Aukerman Co. v. Chaides Const. Co.*, 960 F.2d 1020, 1028, 1034 (Fed. Cir. 1992). If, however, the time period is less than six years, there is no presumption of laches. *Id.* at 1038. The period of delay is measured from the time the patentee knew or reasonably should have known of the alleged infringement by the accused to the date the suit was filed. *See Bott v. Four Star*, 807 F.2d 1567, 1 U.S.P.Q.2d 1210, 1216 (Fed. Cir. 1986); *see also Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1326, 206 USPQ 577, 587 (5th Cir. 1980).

The prejudice suffered by a defendant in the application of a laches defense "may be either economic or evidentiary." *A.C. Aukerman Co.*, 960 F.2d at 1033. "Evidentiary or 'defense' prejudice may arise by reason of a defendant's inability to present a full and fair defense on the merits due to a loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id.*; *see also Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed. Cir. 1988). When the consequences of an untimely filed or delayed complaint cause a defendant to suffer monetary loss, *e.g.*,

"incur[ring] damages which likely would have been prevented by earlier suit," a finding of economic prejudice may be warranted. *A.C. Aukerman Co.*, 960 F.2d at 1033.

In this case, Defendant argues that Plaintiff unreasonably delayed filing its lawsuit and the delay resulted in prejudice suffered by Defendant.  Defendant contends the delay between when Plaintiff became reasonably aware of potential infringement and when the complaint was filed prejudiced Defendant's evidentiary defense of this patent infringement action because of Plaintiff's document destruction program. *See TWM Mfg. Co., Inc. v. Dura Corp*, 592 F.2d 346, 349 (6th Cir. 1979).  Plaintiff's document destruction program about which Defendant complains is instituted once every three years and allegedly destroyed accounting documentation "necessary [for Defendant] to challenge Plaintiff's allegations of damages." Defendant contends further that, because Plaintiff delayed in filing a complaint, the fact that Therm-O-Disc had implemented its own record destruction policy, Defendant was prejudiced since Defendant was unable to introduce into evidence a sample control module made by Therm-O-Disc while that company was under contract with Schukra.  The Court concludes otherwise.

In a light most favorable to Defendant, Plaintiff became knowledgeable of potentially infringing conduct by Defendant on or about May 8, 2002, when Plaintiff sent a letter to Schukra indicating that there was a possibility that Plaintiff might have to bring an infringement action.  It was only seven months later, on December 19, 2002, when Plaintiff filed its petition for protection under Chapter 11.  The petition in bankruptcy was, therefore, filed long before Schukra responded to the May 8, 2002 letter (in 2004).  Plaintiff remained in bankruptcy until January 25, 2006, and Plaintiff commenced with its lawsuit on February 16, 2006.  In other words, Plaintiff filed this action only 22 days after emerging from bankruptcy.  Accordingly, the Court concludes that there is no evidence that such "delay" was unreasonable or inexcusable.

The Court also finds that Defendant has submitted no evidence that Defendant has been prejudiced or injured by Plaintiff's "delay" in filing this action.  First, in compliance with Rule 26, Plaintiff disclosed ample records for Defendant to use to challenge allegations of damages via potential infringement. *See* Bates No. N 1 – N 3156.  Second, the information was timely produced by Plaintiff and was sufficient because these records included the necessary financial information for Defendant to challenge any damages amounts.  Third, the Court finds that Defendant suffered no evidentiary prejudice due to Therm-O-Disc's record destruction policy.  There is no evidence on record suggesting Plaintiff was ever aware of this internal company policy used by Therm-O-Disc either before or after the '748 Patent was issued, or, even if Plaintiff was aware that policy existed, that such awareness influenced Plaintiff's decision when to file its complaint.  Moreover, Defendant never explicitly asked for a sample or schematic of Therm-O-Disc's control module.[7]   Rather, Plaintiff is the party that originally subpoenaed Therm-O-Disc, and the answer received provided no indication of when the records were being destroyed (*i.e.*, Therm-O-Disc's records may have been destroyed even before 2002, which was at least five years after Therm-O-Disc's ceased its involvement in this project).  Accordingly, the Court concludes that, even if Plaintiff did delay in filing suit, such "delay" did not unduly prejudice Defendant.  For the above stated reasons, Plaintiff's motion for dismissal of the equitable defense of laches is granted.

**B.  Equitable Estoppel Defense**

---

[7]  The Court also notes that the Court's grant of Defendant's motion for summary judgment based on Co-Inventorship was reversed and remanded back to this Court.  Accordingly, it is not material to include schematics from the Therm-O-Disc module for the resolution of this matter.  Thus, the unavailability of information from Therm-O-Disc because of any delay in the timing of Plaintiff's complaint does not unduly prejudice the Defendant.

"Equitable estoppel is cognizable under 35 U.S.C. § 282 as an equitable defense to a claim for patent infringement." *A.C. Aukerman Co.*, 960 F.2d at 1028.  An equitable estoppel defense has three elements that a defendant must prove:

> (1) The [patentee], who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence.
>
> (2) The [alleged infringer] relies on that conduct.
>
> (3) And the [alleged infringer] would be harmed materially if the [patentee] is later permitted to assert any claim inconsistent with his earlier conduct.

*Id.* at 1041.

Defendant asserts that: (1) Plaintiff sent correspondence to Schukra warning of potential infringement action in 2002; (2) counsel for Defendant (but, at that time, representing Schukra) provided opposing counsel with "the background leading to Schukra's initial contact with Nartron" in October 2004 and an offer to consider a licensing agreement regarding the MCMs; and (3) Plaintiff responded with silence to the October 2004 letter until filing the current action in 2006.  Defendant contends it reasonably relied on Plaintiff's failure to respond to the 2004 letter, thereby incurring tooling and other overhead costs in manufacturing the controllers and, as such, is entitled to an equitable estoppel defense.  The Court disagrees, however, as Defendant has failed to satisfy at least the first two equitable estoppel elements.

First, the fact that Plaintiff did not file suit after receiving the response letter from Schukra's legal counsel in October 2004 does not constitute a misleading communication by Plaintiff such that the failure to respond reasonably suggested that Plaintiff had abandoned any infringement claims.  Second, the uncontroverted evidence reflects that Defendant could not have relied on Plaintiff's silence following the 2004 letter because **Defendant** had no actual

- 34 -

knowledge of the 2002 and 2004 correspondence between Schukra and Plaintiff's counsel until months **after** the commencement of this cause of action.   As Defendant's President, Larry Krueger, admitted at his deposition, neither he nor any other Defendant employee was aware of the 2004 letter until "late 2006."

In addition, the record in this case demonstrates that Defendant and Schukra began collaborating as early as September of 2000 without notifying Plaintiff of these activities.   In September 2000, Schukra sent a letter to Defendant, wherein Schukra stated:

(1) "Schukra acknowledge[d] advising [Defendant] of at least one patent and a continuation patent application off that patent relating to a portion of these subject controls acquired by its current supplier with whom the current generation of controls was jointly developed"; and

(2) "Schukra agrees to indemnify and hold harmless [Defendant] for any claims of infringement for this particular patent and others that may issue from **Nartron** relating to this control module if they may occur prior to our challenge of the **Nartron** patent" (emphasis added).

Accordingly, the Court further finds that Defendant cannot rely on an equitable estoppel defense when Defendant knowingly engaged in clandestine actions with Schukra to replace Plaintiff as Schukra's supplier of the MCMs, especially since such replacement involved supplying "controls" that likely would be subject to claims of infringement.

### C.  Waiver

The Supreme Court has recognized the definition of "waiver" to be "the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).   Defendant has offered no evidence

to show that Plaintiff waived its intellectual property rights *vis a* vis Defendant (or anyone else). In fact, Defendant did not even address this issue in its response to Plaintiff's motion. Moreover, as Plaintiff filed this cause of action within a reasonable period of time (as discussed above), the Court finds that Plaintiff did not intentionally relinquish or abandon its intellectual property rights in the '748 Patent. Accordingly, the Court holds that Defendant's waiver defense fails as a matter of law.

## VII.   ANALYSIS REGARDING PATENT INVALIDITY

In Count I of its Counterclaim, Defendant seeks declaratory judgment of patent invalidity and unenforceability, as set forth in 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, 132 and/or 282. Similarly, as its first affirmative defense to Plaintiff's cause of action, Defendant has pled patent invalidity on the same bases. In addition, in Defendant's third affirmative defense to Plaintiff's cause of action, Defendant has pled unenforceability. Plaintiff has filed motions for summary judgment with respect to Count I of the Counterclaim and Defendant's first and third affirmative defenses.

Pursuant to 35 U.S.C. § 282, a patent issued by the PTO is presumed valid. As the PTO issued the '748 Patent to Plaintiff, Defendant has the burden of proof to demonstrate, by clear and convincing evidence, that the patent is invalid. *See Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238, 2242 (2011) (invalidity defenses in a patent infringement case must be proved by clear and convincing evidence).

### A.  35 U.S.C. § 101

Defendant states that a "genuine invention" inquiry must be made, which intrinsically involves factual inquiry and determination, thus precluding the grant of summary judgment.

Defendant contends that the '748 Patent violates 35 U.S.C. § 101 because Plaintiff was simply hired by Schukra to "productionize" a MCM that had already been conceived of and prototyped by Schukra and Therm-O-Disc.  As discussed above, the Court has concluded that: (1) the '748 Patent was invented by Plaintiff's employees, (2) there are no co-inventors, and (3) Plaintiff did not simply productionize the MCMs for which the '748 patent was issued but, instead, was solely responsible for the design, engineering and development of such MCMs.

The '748 Patent itself describes a MCM and mechanism for implementation into seat controllers, something the Patent Examiner determined did not exist in prior art.  The Court also finds that Defendant has not proffered evidence which would satisfy its burden of showing, by a clear and convincing standard, that the '748 Patent lacked the necessary "utility" component or that it lacked novelty.  The Court therefore holds, as a matter of law, that the MCMs cannot be deemed invalid for lack of utility under 35 U.S.C. § 101.

**B.  35 U.S.C. § 102**

A person shall be entitled to a patent unless: (1) "the invention was known or used by others in this country . . . before the invention thereof by the applicant for patent," or (2) the applicant "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102.  For a patent to be invalidated based on anticipation, there must be a prior art that contains all of the elements in the claim limitations. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).  Based on record before the Court, there has been no evidence submitted that a transparency circuit was in the prior art of this case.  To the contrary, the only evidence regarding the prior art suggests that such prior art did not include a transparency simulator.  As discussed above, according to Schukra's employees (Cherry and Jones), the very reason Schukra hired Plaintiff was to design and engineer a controller with this innovation.

Therefore, the Court concludes that Defendant's repeated argument that there were ride-tested prototypes of massage controllers that were used by Schukra and developed by Therm-O-Disc before Plaintiff was hired are just that – arguments. There is no evidence on the record that the prototypes included a transparency simulator or transparency circuit for maintaining original movement and prioritizing system functions. The Patent Examiner's Reasons for Allowance indicate that the inclusion of the transparency simulator was of paramount importance in distinguishing the limitations found in the claims of the '748 Patent from the prior art.

For all of the foregoing reasons, the Court finds, as a matter of law, that the '748 Patent cannot be ruled invalid pursuant to 35 U.S.C. § 102.

### C.  35 U.S.C § 103

In support of its belief that the '748 Patent is invalid under 35 U.S.C. § 103 (obviousness), Defendant again relies on the argument that the named inventors did only what they were instructed to do and that what they did was only to productionize the functioning seat massager prototyped and ride-tested by Schukra. As discussed above, this argument is futile. Defendant also contends that prior art had defined what needed to be done in order to make a circuit transparent to a controller in the vehicle (or the vehicle computer), and Defendant cites U.S. Patent No. 6,145,494 (the "'494 Patent") as evidence of such prior art. Defendant does not, however, offer evidence that shows how the '494 Patent defined what needed to be done in order to create an operable transparency simulator. Moreover, the Patent Examiner expressly addressed the prior art. Accordingly, the Court concludes that an invalidity defense pursuant to 35 U.S.C. § 103 is not viable, as a matter of law, because Defendant cannot satisfy its burden by clear and convincing evidence.

**D.  35 U.S.C § 112**

Defendant's entire argument in support of its claim of invalidity under 35 U.S.C. § 112 was:

> 35 U.S.C. § 112 has requirements that are placed into effect so that the specification and drawings of a patent are set forth "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 113 has similar requirements and indicates that drawings cannot be supplemented.  In a patent [such] as the one in the present litigation, a claim can only cover elements that are sufficiently disclosed in the drawings and specification. *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 237 (1942) ("an invention must be capable of accurate definition and it must be accurately defined, to be patentable").

> This defense is contingent on how Plaintiff interprets its claims and interprets its specification in light of Defendant['s] defenses.  Certain claim terms, such as "complimentary" [sic] which are definite in dictionaries and not found in the patent specification are impacted by 35 U.S.C. § 112, and at least Claim 2 is invalid due to lack of specificity under this statute.  The terms "driver," "transparency simulator," and other terms in the claims need to be defined by the Court under *Markman* determinations.  35 U.S.C. § 112 acts as a constraint in that determination, but also would invalidate anything that is argued contrary to the dictates of those sections.  Thus, the bulk of the arguments relating to those sections await Plaintiff's claim construction arguments and responses to Defendant's Motions for Summary Judgment, and deference is requested until that time to determine which specific arguments need to be addressed, if any, beyond claim 2, which is clearly invalid.

As noted above, however, the '748 Patent is presumed valid and a party's burden to overcome that presumption is by clear and convincing evidence.  As the foregoing reflects, Defendant has offered no evidence regarding the manner in which the '748 Patent is invalid pursuant to 35 U.S.C. § 112.  Accordingly, the Court concludes that, as a matter of law, Defendant has not met its burden, and Defendant's defense of invalidity pursuant to 35 U.S.C. § 112 is therefore denied.

**E.  35 U.S.C. §§ 115 and 116 (and 256)**

Sections 115, 116 and 256 (which was not pled by Defendant but is argued by Defendant in response to Plaintiff's motion) pertain to co-inventorship/joint inventorship.  As it did to support many of its other motions/responses, Defendant bases its argument that the '748 Patent is invalid pursuant to Sections 115, 116 and 256 on the belief that Benson is a co-inventor.  As the Court has determined, however, Benson is not a co-inventor.  Accordingly, the Court holds, as matter of law, that the invalidity defenses pursuant to 35 U.S.C. §§ 115 and 116 (and 256) are not viable.

**F.  Inequitable Conduct**

Inequitable conduct by a patentee may serve as evidence to support the equitable defense of unenforceability of a patent.

> Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, couple with an intent to deceive.

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).  As evidence of Plaintiff's inequitable conduct, Defendant cites: (1) the fact that the patent application failed to acknowledge the contributions/co-inventorship of Benson, Schukra, Therm-O-Disc and/or Delphi; and (2) Plaintiff's claimed responsibility for inventorship even though Plaintiff did nothing other than do what it was requested to do by Schukra.  As set forth above, the Court has considered and rejected those arguments in numerous contexts.  The Court also does not find such arguments persuasive to demonstrate inequitable conduct by Plaintiff.  Accordingly, the Court concludes that Defendant's defense of unenforceability is not sustainable, as a matter of law.

## VIII.   ANALYSIS REGARDING SHOP RIGHT AND LICENSE

Plaintiff also seeks summary judgment on Defendant's Counterclaims in Counts III (Shop Right) and Count IV (License).

### A.  Shop Right

> A "shop right" is generally accepted as being a right that is created at common law, when the circumstances demand it, under principles of equity and fairness, entitling an employer to use without charge an invention patented by one or more of its employees without liability for infringement.

*McElmurry v. Arkansas Power & Light Co*., 995 F.2d 1576, 1580 (Fed. Cir. 1993) (footnote omitted).  Whether an employer has acquired a shop right is determined by examining a totality of the circumstances to determine if the facts of the case demand a finding of the same. *Id*. at 1581-82.  The shop right is personal to the employer and cannot be licensed or assigned. *Francklyn v. Guilford Packing Co.*, 695 F.2d 1158, 1162-63 (9th Cir. 1983).

Plaintiff first asserts that Defendant can have no shop right because there is no employer-employee relationship between them.  Plaintiff also argues that, because Schukra never paid Plaintiff for resources expended by Plaintiff in development of the patented MCMs, Defendant (and Schukra) are foreclosed from asserting a shop right.  Finally, Plaintiff notes that the "Terms and Conditions" set forth on Plaintiff's standard quotation forms clearly provide (emphasis in original):

> Notwithstanding any term in Buyer's purchase order or other documents of Buyer to the contrary, Buyer should acquire <u>no</u> interest in any proprietary design or other intellectual property of Seller evident in the goods applied by Seller pursuant to Buyer's order.

Defendant cites two Ninth Circuit cases to support its contention that a shop right "is not restricted alone to the case of an employer." *Kierulff v. Metropolitan Stevedore Co.*, 315 F.2d

839, 842 (9th Cir. 1963); *Francklyn*, 695 F.2d at 1160 ("the full nature of the parties' relationship must be examined to determine whether a shop right exists, not merely whether that relationship is characterized as an employment or as an independent contractual arrangement"). Defendant argues that Schukra: (1) hired Plaintiff to develop the MCMs, (2) paid Plaintiff to develop them, (3) directed Plaintiff as to the manner and method of developing the MCMs, and (4) at least in part, afforded Plaintiff a facility, tools and equipment to develop the MCMs. Under applicable law, if Schukra has shop rights to the '748 Patent, Schukra would be legally entitled to request that Defendant supply it with MCMs without the possibility of infringement. *McElmurry*, 995 F2d at 1584.

The Court finds Defendant's argument unpersuasive. First, this Court is not bound by the Ninth Circuit and, particularly in this patent action, shall adhere to the law of the Federal Circuit, a court that exists to, among other things, create national uniformity in patent law. As such, the Court relies on the *McElmurry* decision for the definition of shop right and concludes that an employer-employee relationship is necessary. Second, the contract between Plaintiff and Schukra is the best evidence of the agreement between them (and their relationship). The contract expressly states: "Buyer [Schukra] should acquire no interest in any proprietary design or other intellectual property of Seller evident in the goods applied by Seller [Nartron] pursuant to Buyer's [Schukra's] order." The language is not ambiguous or susceptible to multiple interpretations—Schukra was not entitled to any rights (co-inventor, shop rights or otherwise) as a result of its order from Nartron regarding products to be supplied by Nartron. Accordingly, the Court finds that Defendant's shop right counterclaim (Count III of its counter-complaint) fails as a matter of law. Therefore, Plaintiff's Motion for Summary Judgment on Count III of Defendant's counter-complaint is granted.

### B.  License

According to Defendant, Count IV of its counter-complaint alleges, in relevant part:

> 20.    Upon information and belief, as a result of the contract between Plaintiff and third parties for the development, design and manufacture of the Seat Controls, the third parties are the rightful owners of the technology described in the '748 patent, including the Seat Controls, in all or in part. *As owners or co-inventor's assignees, these third parties have the full right, royalty-free license and/or shop right* to make, use, sell or offer to sell all technology described or claimed in the '748 patent, which includes the right to make, use and sell the Seat Controls at issue in this case, *and have them made by [Defendant] or anyone else who relates back to the third party owners, assignees or license holders*, via license.

> 21.    As the technology described in the '748 patent is co-owned by Plaintiff *and these third parties*, Plaintiff has no right to seek claims against Schukra or [Defendant] for patent infringement.

> 22.    [Defendant], therefore, respectfully seeks judgment as herein set forth.

As the foregoing allegations (and the entirety of Defendant's arguments in its response) make clear, Defendant again relies on the belief that Benson/Schukra were co-inventors of the '748 Patent and/or that Schukra had a shop right to the '748 Patent.  As set forth above, both of those arguments are unavailing.  In addition, the Court notes that it is undisputed that Plaintiff did not grant Defendant (or Schukra) an express license to use the '748 Patent.

Finally, the Court concludes that there is no implied license between Plaintiff and Schukra/Defendant.  In order to find that an "implied license" exists, the Federal Circuit has stated:

> A patentee grants an implied license to a purchaser when (1) the patentee sells an article that has no noninfringing uses and (2) the circumstances of the sale plainly indicate that the grant of the license should be inferred. *Met-Coil*, 803 F.[2]d at 686, 231 U.S.P.Q. at 476.

*Anton/Bauer, Inc. v. Pag, Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003).  "An implied license signifies a patentee's waiver of the statutory right to exclude others from making, using, selling, offering to sell, or importing, the patented invention." *Winbond Electronics Corp. v. International Trade Com'n,* 262 F.3d 1363, 1374 (Fed.Cir.2001).  The defense has three elements that closely resemble those of equitable estoppel: "(1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim." *Id.* at 1374.  For the reasons set forth above, especially in Section VI.B., the Court concludes that, as a matter of law, there is no implied license to the '748 Patent that extends from Plaintiff to Schukra/Defendant.

Accordingly, and for the reasons set forth above, the Court finds that Count IV of Defendant's counter-complaint fails as a matter of law and, therefore, Plaintiff's motion for summary judgment on Defendant's license claim under Count IV of the counter-complaint must be granted.

## IX.    CONCLUSION

For the reasons set forth above, the Court hereby ORDERS that:

1.   Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims in Count III (Shop Right) and Count IV (License) (Docket #95) is GRANTED;

2.   Plaintiff's Motion for Summary Judgment on the First Affirmative Defense (Patent Invalidity) and Counterclaim Count I (Declaratory Judgment of Patent Invalidity and Unenforceability) (Docket #96) is GRANTED;

3.   Plaintiff's Motion for Summary Judgment on Defendant's Fourth Affirmative Defense (Laches, Estoppel and Waiver) (Docket #97) is GRANTED;

    4.  Plaintiff's Motion for Summary Judgment on Infringement by Defendant (Docket #100) is GRANTED;

    5.  Defendant's Motion for Partial Summary Judgment Based on the Lack of Infringement (Docket #101) is DENIED; and

    6.  Defendant's Motion to Dismiss on Summary Judgment Based on Co-Inventorship (Docket #102) is DENIED.

IT IS FURTHER ORDERED that:

    A.  Plaintiff's Motion to Strike (Docket #127) is DENIED;

    B.  Plaintiff's Motion for Leave to File a Response to Defendant's Notice of Correction (Docket #139) is DENIED; and

    C.  Defendant's Motion for Attorney Fees (Docket #170) is DENIED, in that the motion was based on this Court's ruling granting Defendant summary judgment in this cause of action (Docket #166), a ruling that was reversed by the Federal Circuit.

IT IS FURTHER ORDERED that counsel for the parties appear for a Final Pre-trial Conference on April 5, 2012, at 11:30 A.M., 526 Water Street, Port Huron, MI.  All counsel must be present, as well as the clients and/or those with full settlement authority.  The proposed pretrial order, along with joint-agreed upon jury instructions, shall be submitted to the Judge's Chambers at the Final Pretrial/Settlement Conference.  If necessary, the case will be scheduled for a trial date at the conference.

IT IS SO ORDERED.

                                      S/Lawrence P. Zatkoff
                                      LAWRENCE P. ZATKOFF
                                      UNITED STATES DISTRICT JUDGE

Dated:  January 26, 2012